FILED
2015 FEB 19 PM 12:13
CLERK
U.S. DISTRICT
COURT

IN THE UNITED STATES DISTRICT COURT
CENTRAL DIVISION, DISTRICT OF UTAH

| | |
|---|---|
| SHAUNA NEBEKER,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL AUTO PLAZA and KOLBY HANSEN,<br><br>Defendants. | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br><br>Case 2:13-cv-00885-BSJ |

Defendants' Motion for Summary Judgment[1] came before the court for hearing on December 5, 2014, at 1:30 p.m. Defendants National Auto Plaza and Kolby Hansen were represented by Erik A. Olson and Trevor C. Lang. Plaintiff Shauna Nebeker was represented by April L. Hollingsworth and Ashley F. Leonard. The court ruled in open court granting Defendants' motion. The court requested Defendants prepare a suggested form of order, which Defendants submitted to the court on December 15, 2014. Plaintiff subsequently filed objections to Defendants' suggested order on December 19, 2014,[2] which Defendants responded to on December 22, 2014.[3]

Having considered the parties' briefs, the evidence presented, the suggested orders, the arguments of counsel, and the relevant law, the court GRANTS Defendants' Motion for Summary Judgment.

---

[1]Mot. for Summ. J. and Supporting Mem., filed Sep. 15, 2014 (CM/ECF No. 51).

[2]Pl.'s Objections to Defs.' Proposed Order for Summ. J., filed Dec. 19, 2014 (CM/ECF No. 81).

[3]Resp. to P.'s Objections to Defs.' Proposed Order Granting Summ. J., filed Dec. 22, 2014 (CM/ECF No. 82).

# I. DISCUSSION

Defendants' motion sought summary judgment against Plaintiff for all three causes of action: (i) wrongful termination in violation of public policy; (ii) violation of the Family Medical Leave Act ("FMLA"); and (iii) violation of the Americans with Disabilities Act ("ADAAA"). For the reasons discussed below, the court finds summary judgment is warranted on all claims.

## A. Wrongful Termination in Violation of Public Policy

A critical component of any wrongful termination claim is that a termination actually occurred—that the claimant was actually fired by his or her employer. In the present case, this component is missing.

Plaintiff and Defendants contest the appropriate standard for determining whether a termination occurred. Defendants cite *Bodmer v. Police Mut. Aid Ass'n*, 94 Utah 450, 456 (Utah 1938) for the proposition that "[t]here is a discharge when there is an intention to discharge evidenced by acts which unequivocally show the intent."[4] Although wrongful termination is a state law claim, Plaintiff does not contest this standard by pointing to a contrary definition in Utah case law. And the court was unable to find one. Instead, Plaintiff extracts her standard from the Tenth Circuit case *Taylor v. Tulsa Tribune Co.*, which arose from an appeal from the Northern District of Oklahoma.[5] There the Tenth Circuit stated, "And any acts or words which show a clear intention on the part of the employer to dispense with the services of the employee, and which are equivalent to a declaration that the services will no longer be required or accepted,

---

[4] Mot. for Summ. J. and Supporting Mem., filed Sep. 15, 2014 (CM/ECF No. 51), at v.

[5] Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J., filed Nov. 24, 2014, CM/ECF No. 75, at x-xi [hereinafter Opposition].

are sufficient to effect a discharge." 136 F.2d 981, 983 (10th Cir. 1943). One case the Tenth Circuit cites for this proposition, however, is *Bodmer*.

The court notes that even if Plaintiff needed only to show "clear intention on the part of the employer to dispense with the services of the employee" to show termination, Plaintiff would have still failed to meet this burden. Plaintiff's evidence, under either standard, cuts against termination. The court draws on Plaintiff's own deposition testimony:

> Q. Okay. Walk me through what happened on February 9th, your last day at National Auto Plaza.
>
> A. Work just like normal.
>
> Q. Yeah. When did you arrive?
>
> A. I don't recall. Probably, my guess, 9:30, 9:00, 9:30. I don't recall. And Kolby was on maternity leave with his wife; they had just had their second child. And I quite frankly, I didn't expect him in the office that day. And when I saw him in the office -- well, actually, let me reiterate, let me go back. That morning, after all -- everything that had happened with Kory, his brother, and things were going in a direction I did not approve of, I told Stephanie Gower that morning: I'm going to be writing an e-mail to Kolby, and if anything happens to me you'll know why. And that was first thing in the morning. And then when I saw him in the office, again I was not expecting him. He was on maternity leave. He didn't call me and tell me he was coming in. I sent the e-mail. And after -- after him calling me into his office and berating me, going down -- again, going down a timeline. He started out as: This isn't working for me. And berated me, and I was really tired of conflict with him, battles with him, being yelled at. **And he said: What do you have to say? And I said: This isn't working for you. And I got up and left.** I did actually try going back into his office. I don't know how much time had passed, and he had already left by that point. Because quite frankly, I was pretty freaked out.
>
> Q. Okay. What happened next?

> A. Stephanie came in and she said: Kolby said that you -- not quit -- resigned. And I said: Oh, no, I did not resign.
>
> . . .
>
> Q. Okay. So you went over to his office, and you mentioned earlier that he berated you. Can you just give me the detail of what exactly was discussed during this five-minute conversation?
>
> A. I reiterate, the first thing he said was: This isn't working for me. He went down on his cell phone a time frame of -- I don't know, I'm guessing someone filling him in on my attendance or when I was late, that was my guess. And he kept going down this timeline or a time frame, excuse me. And just kept going on and getting louder and louder. **And then after he was done going through that, he said: What do you have to say? And I said: I guess this isn't working for you. And I walked out.**
>
> Q. Okay. You indicated that he went down some kind of timeline of your attendance. And he was going on and it got louder and louder. What specifically was he saying during this period of time?
>
> A. That was it. I -- I just let him go, and he just kept getting louder. He was sitting back in his chair like this with his cell phone, just like this. And I knew there was nothing good going to come out of that conversation, so I just let him go.
>
> Q. What do you mean you let him go? You let him keep talking?
>
> A. Yeah.
>
> Q. Okay. But what specifically was he saying to you?
>
> A. He was just saying that the time frame of -- you got here at this time; you got here at this time, et cetera. That's what the whole conversation was.
>
> Q. Okay. So when you say "he kept going on and he got louder and louder" what -- all that he was saying to you

4

|   |   |
|---|---|
|   | from his first statement, "this isn't working for me," was the detail on this log of when you were going into the office; is that right? |
| A. | Right. He made a comment about I was a no-call -- or no-show, no-call. And I said, no. And he said, shut up, and kept going. Listen, and that's what he said. And I just said okay. So I just --kept talking, that was it. That was it. |
| Q. | You don't recall any other comments that he made during this conversation? |
| A. | Nope. Other than the one I just told you. |

. . .

| | |
|---|---|
| Q. | **Okay. Did Kolby Hansen tell you to pack your things?** |
| A. | **He did not tell me to pack my things.** |
| Q. | **Did he tell you you're fired or you're out of here or anything else along the lines of you being terminated? Did he say anything of that nature?** |
| A. | **He did not say anything like that.** |

CM/ECF No. 75-1, at 76:7-77:17; 85:1-86:21; 90:16-22 (emphasis added).

Plaintiff's testimony does not demonstrate there was a clear intent to terminate her. In fact, Plaintiff's testimony suggests that Plaintiff resigned from her employment with Defendant National Auto Plaza. As Plaintiff testifies, Defendant Hansen never told her she was terminated or asked her to pack her things and leave. It was upon Plaintiff's own initiation and volition that Plaintiff walked out of the February 9, 2012 meeting, packed up her belongings, and left the workplace.

Having failed to demonstrate a termination occurred, the court need not address whether there was a violation of public policy in order to grant summary judgment against Plaintiff's

wrongful termination claim. However, the court notes that the wrongful termination claim also fails on this front.

Plaintiff argues she was "terminated" for refusing to follow Defendant Hansen's direction to pay his brother, Kory Hansen, in checks payable to cash for Kory's buyer fees. Plaintiff contends Defendant Hansen did so in order to "hide his brother's income from state and federal authorities."[6] Plaintiff argues her termination violated the public policy of citizens paying taxes.[7] Plaintiff cites to *Peterson v. Browning*.[8] *Peterson* states that "an attempt to coerce an employee to violate the state tax law and federal customs statute at issue contravenes the clear and substantial public policies of the state of Utah." 832 P.2d 1280, 1283 (Utah 1992). However, Plaintiff points to no state tax law provision or other state law statute that prohibits an employer from paying costs, buyer's fees or otherwise, in checks payable to cash. In fact, Plaintiff acknowledges that giving an amount of money in the form of a check payable to cash is not unlawful.[9] And Plaintiff admits that there is no provision of the tax code that requires people be paid in cash or not in cash.[10] In *Peterson*, the plaintiff alleged he was terminated for refusing to falsify tax and customs documents. *Id.* Plaintiff in the present case makes no such allegation—she was not asked to falsify tax documents. And Plaintiff has not provided evidence that Defendants submitted or attempted to submit false tax documents to tax authorities. In fact,

---

[6]*Id.*, at 3-4.

[7]Hr'g 12/05/14 Tr., 36:11-15; 37:8-25; 41:17-22.

[8]Opposition, *supra* note 5, at 3.

[9]Hr'g 12/05/14 Tr., 39:7-14.

[10]*Id.*, at 40:20-41:6.

6

Plaintiff cannot even demonstrate that Defendants mischaracterized the payments to Kory Hansen in National Auto Plaza's own books.[11]

In a portion of *Peterson* not quoted by Plaintiff, the *Peterson* court stated as follows:

> This court has indicated that it will narrowly construe the public policies on which a wrongful termination action may be based. *Caldwell v. Ford, Bacon & Davis Utah, Inc.,* 777 P.2d 483, 485 (Utah 1989); *Berube,* 771 P.2d at 1043. It is not the purpose of the exception to eliminate employer discretion in discharging at-will employees, *Hodges,* 811 P.2d at 165, or to impose a requirement of "good cause" for the discharge of every employee. Accordingly, we hold that the public policy exception applies in this state when the statutory language expressing the public conscience is clear and when the affected interests of society are substantial. The identification of clear and substantial public policies will require case-by-case development.

*Id.,* at 1282. Plaintiff does not point to statutory language clearly expressing a public conscience against employers making payments in checks payable to cash or any other means the employer deems appropriate.

Without sufficient evidence of either a termination or a violation of public policy, the court finds summary judgment is warranted for the wrongful termination claim.

### B. Violation of the FMLA

Plaintiff argues Defendants violated the FMLA by interfering with her right to FMLA leave.[12] Although Plaintiff acknowledges she never asked for FMLA leave,[13] she argues that an employee does not have to do so to trigger employer duties, looking to the Tenth Circuit's

---

[11] *Id.,* at 40:4-7.

[12] Opposition, *supra* note 5, at 11-14; Compl., filed Sep. 30, 2013 (CM/ECF No. 2), at para. 36-39.

[13] Shauna Nebeker Deposition, CM/ECF No. 75-1, at 152:23-153:5.

opinion in *Tate v. Farmland Indus., Inc.*[14] In *Tate*, the Tenth Circuit reversed a lower court's dismissal of a FMLA claim and stated the following:

> The district court also reasoned that Plaintiff failed to allege he requested FMLA benefits from Defendant. The district court concluded such an allegation was necessary to maintain an action under the FMLA because "[i]t is axiomatic that defendant cannot have denied benefits that were never sought." The FMLA, however, does not require a covered employee to specifically ask for FMLA benefits. An employee need not expressly assert rights under the FMLA or even mention the FMLA. *See* 29 C.F.R. §§ 825.302(c), 825.303(b); *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 761-64 (5th Cir.1995). If the employer is on notice that the employee might qualify for FMLA benefits, the employer has a duty to notify the employee that FMLA coverage may apply. *See* 29 C.F.R. § 825.208(a). Pending its review of Plaintiff's health status, Defendant placed Plaintiff on involuntary sick leave. Thus, Defendant was clearly on notice that Plaintiff might qualify for FMLA benefits since Defendant triggered Plaintiff's leave. Given Plaintiff's allegation that Defendant placed him on sick leave, Plaintiff need not allege he provided Defendant with notice of his rights under the FMLA.

268 F.3d 989, 997 (10th Cir. 2001) (footnote omitted).

While Plaintiff is correct that she did not have to specifically ask for FMLA leave, it is important to note the Tenth Circuit's qualifier in the *Tate* decision: "**[i]f the employer is on notice that the employee might qualify for FMLA benefits**, the employer has a duty to notify the employee that FMLA coverage may apply." The Tenth Circuit revisited this point in *Howard v. Garage Door Group, Inc.*, in an unpublished opinion:

> An employer, however, is obligated under § 2615(a) to specifically inform an employee of his or her right to FMLA leave only when the "employer is *on notice* that the employee might qualify for FMLA benefits...." *Tate*, 268 F.3d at 997 (emphasis added). At a minimum, this requires that the employer be on notice that the employee wants leave. This notice can arise from verbal

---

[14]Opposition, *supra* note 5, at xxxiii.

>notification from the employee, *see, e.g.,* 29 C.F.R. § 825.302(c) ("An employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave.") It could also be inferred from an employer's own act of placing the employee on sick leave, *Tate,* 268 F.3d at 998 ("Given Plaintiff's allegation that Defendant placed him on sick leave, Plaintiff need not allege that he provided Defendant with notice of his rights under the FMLA").

136 F. App'x 108, 114 (10th Cir. 2005).

In the present case, the court finds Plaintiff failed to place Defendants on notice that Plaintiff had a serious health condition that warranted FMLA leave. Plaintiff tries to use various forms of evidence to demonstrate notice. But, in each case, the evidence is insufficient.

Plaintiff points to a document she typed, printed, and brought with her to a March 2011 meeting with Defendant Hansen.[15] The document contains ten paragraphs outlining several of Plaintiff's frustrations.[16] Of the approximately sixty lines of text, Plaintiff points to two sentences in separate paragraphs that state "My stress level has increased dramatically because of these issues which, and with what I have gone through physically, it's obviously had a negative impact on me," and "Obviously, it's been my health and well-being that has been affected by these and other issues that I've literally had no control over because of your decisions."[17] However, despite bringing this paper with her to the March 2011 meeting, Plaintiff acknowledged in her deposition the limitations of her actual conversation with Defendant Hansen during the meeting:

---

[15] *Id.,* at xxxix, para. 9.

[16] CM/ECF No. 75-6; *see also* Shauna Nebeker Deposition, CM/ECF No. 75-1, at 44:17-46:10.

[17] CM/ECF No. 75-6, para. 9, 10.

Q. Okay. Did you discuss in this conversation you had in March of 2011, any of your medical reasons that you were dealing with at that point in time?

A. No. That -- like I said, I think in the very beginning that maybe was the topic he wanted to discuss. But it never came to fruition until the very end until we were getting up, and he said: I need you to be here. And I said: I'm trying, I'm doing my best. But it was nothing specific. It was more based upon what I had written down because of the frustrations that I was dealing with.

Q. So again, what you had written down did not necessarily pertain to a medical condition. It was more frustration with what you were dealing with at work?

A. I know -- I think it touched on some of the medical problems. I just honestly do not remember verbatim what it said.

Q. And just to confirm, the extent to which you discussed a medical condition with Kolby Hansen during that March of 2011 meeting to your perception was simply Kolby Hansen saying you need to be here and your responding that you were doing the best you could do; is that correct?

A. That's correct.

Q. Did you request during that March of 2011 meeting that Mr. Hansen -- that Kolby Hansen provide some -- some other type of accommodation to you in connection with your employment, such as fewer hours, working from home or anything else along those lines?

A. I didn't feel I could.

Q. Okay. And why is that?

A. Because I was asked to be there: I need you here.

CM/ECF No. 75-1, at 46:11-47:20.

Plaintiff also argues Defendants knew she had migraines, anxiety, and that she had surgery to have an ovary taken out, pointing to her own deposition (CM/ECF No. 75-1, at 149:1-151:20) and Defendant Hansen's deposition (CM/ECF No. 75-3, at 96).[18] But these deposition excerpts only create a nebulous suggestion of health-related conversations between Plaintiff and Defendant Hansen. They are insufficient to put Defendants on notice that Plaintiff had a serious health condition and may be entitled to FMLA leave.

Further, Plaintiff argues it was common knowledge around the office that she was missing work for health issues.[19] Plaintiff points to a September 23, 2014 declaration by fellow employee Verity Curley, which states as follows:

> Ms. Nebeker routinely talked about her ongoing health issues, including her TMJ, depression, and migraines. Everyone in the office knew Ms. Nebeker was not well because she had quite a bit of absenteeism over those issues. People in the office would say, "Shauna is sick again," and knew she was missing work because of her health issues.

CM/ECF No. 75-7, at 2. But in an earlier, April 25, 2014, declaration, Curley stated that, while Plaintiff occasionally complained about migraines and jaw soreness, she was unaware Plaintiff had any type of diagnosed medical condition, she was unaware of any request from Plaintiff to take time off for her claimed migraines or jaw soreness, and she believed National Auto Plaza would not have denied any request for extended time off due to medical reasons. CM/ECF No. 77-6, at 2-3.[20] In addition to what seem to be inconsistencies between Curley's two declarations,

---

[18]Opposition, *supra* note 5, at xxxix, para. 10.

[19]*Id.*, at xxxix, para. 11.

[20]In the April 25, 2014 declaration, Curley also stated that Defendant Hansen was required to be frequently out of the office. CM/ECF No. 77-6, at 2-3. If Defendant Hansen was frequently absent, it is unclear to the court that Defendant Hansen could even be aware of Plaintiff's medical issues to the same limited extent Curley was.

the idea that Plaintiff's serious health condition was common knowledge in the office seems inconsistent with fellow employee Stephanie Gowers's declaration. Therein, Gowers states, "Near the end of Shauna's employment, she missed at least one full day of work each week and was commonly late—typically claiming some vague excuse (e.g., "she didn't sleep well," "she didn't feel well," or "she had a headache" etc.)." CM/ECF No. 77-4, at 2. Further, Gowers states, "At one point, I told Shauna that she should consider talking to Kolby Hansen ("Kolby") about her unexplained absences, but Shauna refused and stated that she did not want Kolby knowing about her personal life." *Id.*

Plaintiff also argues Defendants had notice Plaintiff may be entitled to FMLA leave by pointing to evidence that Defendant Hansen saw her at work wearing sunglasses.[21] However, Plaintiff has not provided evidence that Defendant Hansen knew she was wearing sunglasses for migraines.[22] But Plaintiff did provide evidence through her deposition that she thinks "everybody at National has shown up to work hung over at one time or another. It's pretty prevalent that -- or notorious, I should say, in the dealership or auto industry that people drink, other -- you know, choose to do other things. It's pretty prevalent in this industry. So yes, I have shown up hung over before." CM/ECF No. 75-1, at 155:17-23.

Finally, Plaintiff also argues Defendant Hansen gave her a gift certificate for a massage. But, again, this evidence has nominal value in demonstrating Defendants had notice that Plaintiff had a serious health condition that might entitle her to FMLA leave. While Plaintiff initially

---

[21]*Id.*, at xxxix, para. 12.

[22]The Kolby Hansen deposition testimony Plaintiff points to indicates that Defendant Hansen "remember[ed] her wearing sunglasses sometimes at work," but does not indicate what he knew, or even thought, the impetus for such behavior was.

asserted that when Defendant Hansen gave her the gift certificate he said he hoped the massage would help with her headaches, this was later refined:

> Q.  Did he tell you that he hoped it would help with headaches or migraines, or do you not recall?
>
> A.  I don't recall. Just the fact that he got the gift certificate, I thought was actually really kind.

CM/ECF No. 75-1, at 66:22-67:2. The issue was briefly touched upon in Defendant Hansen's deposition:

> Q.  Did you give Shauna a gift certificate to get a massage at some point?
>
> A.  I did.
>
> Q.  Why was that?
>
> A.  Because I'm a nice guy.
>
> Q.  You weren't aware that she was having some health problems and that might help?
>
> A.  She might have been complaining about her back and I said, hey, I've got a great lady; let me buy you a massage.
>
> Q.  When was that?
>
> A.  I don't recall. It's been a lot of years. I don't know. Three years ago, three and a half years ago. I don't recall.

CM/ECF No. 75-3, at 99:14-100:2.

The evidence Plaintiff has provided, taken individually or collectively and viewed in a light most favorable to the Plaintiff, insufficiently demonstrates Defendants had notice of a

13

possible serious health condition that could warrant FMLA leave. As such, the court finds the FMLA claim fails and summary judgment should be granted.[23]

### C. Violation of the ADAAA

Plaintiff argues Defendants discriminated against her and violated the ADAAA in two ways: (i) by terminating Plaintiff; and (ii) by failing to make reasonable accommodations for her conditions.[24] As previously discussed, there is insufficient evidence that Plaintiff was terminated. Therefore, the court examines whether Defendants failed to make reasonable accommodations for Plaintiff's conditions.

Defendants' counsel asked Plaintiff during deposition about the reasonable accommodations she wished Defendants would have made for her, and her response indicates she wished they had given her emotional support and an opportunity to find out what was medically wrong with her:

> Q. As you look back on your experience at National Auto Plaza, what would you have wanted National Auto Plaza to do differently for you with regard to your medical conditions?
>
> A. I think if I could have had the time off consecutively to find someone to help me. I mean, in all -- when I went to -- basically, it took a blood test. If somebody would have just helped me -- well, it was an in-depth blood test. It wasn't just an every-day, run-of-the-mill blood test. It took more than just that. If I would have been -- had that opportunity, I would have been able. I think a lot of not knowing what was going on was -- that just sucked. Because people think

---

[23] As further support of its decision to grant summary judgment on Plaintiff's FMLA claim, the court notes Plaintiff's admission that she continued to receive a regular salary from Defendants throughout her employment. Plaintiff acknowledged that whenever she took time off, whether for good reasons or otherwise, her checks continued as normal and her pay was not docked. Hr'g 12/05/14 Tr., 61:20-62:3; 62:14-18; 75:15-19.

[24] Compl., filed Sep. 30, 2013 (CM/ECF No. 2), at para. 46-48; Opposition, *supra* note 5, at xxx.

whatever they'd like to. But you know in your heart you feel like you're crazy but you're not.

Q. Uh-huh (affirmative).

A. And I think had I been given that opportunity to find out what was wrong. Without going to the same people, if I could have found whom I found after I left and given that chance, I think I could have been recuperated and been so much better so much sooner. However if Kolby would have or could have understood that and allowed that, I think that part of it and the physical part of it would have done wonders.

Q. And I'm not sure I follow you. What specifically did you want National Auto Plaza to do in that regard? Did you want them to find a physician for you who was suitable? What did you want them to do?

A. No. To allow me to find somebody. Because I kept going to the same places, asking what's going on? You're my internist, you should know more what's going on. Tried seeking out the TMJ. Everything kept treating a symptom. And I just knew that there was more to it, but I'm not a medical person. I didn't know. But I knew something wasn't right. And to be given the time to find that, to find someone that could help me and to know I had that support would have been gigantic. I had very little support at that time. And when you don't feel good and on top of it you don't have support, it's just really awful. It's very lonely. It's very alienating. And you're trying to do the best you can do, and you're not getting answers. And it's the most frustrating thing.

Q. When you say "support," do you mean support from National Auto Plaza and what support are you referring to?

A. I think just emotional support. Kolby was -- I wanted so much success. I mean I really did especially after Lloyd passed away, I really wanted -- things were going so well. And I felt like it got to the point of where he was -- if I didn't think it, his actions spoke louder. Because I felt he was so glad he berated me in front of people even. It's like he couldn't hide this anger. For me, that's what I thought it

15

> was, was anger. And if I would have known that he would
> have supported that and said, you know what, I'm not sure
> what's going on either but take some time off. Why don't
> you go ahead and seek that help. You have no idea what
> that would have done. It would have been -- it would have
> been awesome. But I didn't feel like I could leave because
> he strenuously kept telling me: You need to be here; you
> need to be here.

CM/ECF No. 75-1, at 158:24-161:15.

Critical to this analysis, however, is the very next question and answer exchange in Plaintiff's deposition:

> Q. Did you explain to him that you needed time to know what the problem was, that you needed time to seek out a different doctor because the ones you were dealing with weren't giving you the answers that you needed? Did you explain that to him?
>
> A. I didn't feel like I could. It was always: You need to be here. Clearly it didn't matter.

*Id.*, at 161:16-23. This response by Plaintiff is consistent with her other statements that she never made a request for FMLA leave and that, while she took medical leave from time to time, there was nothing in addition that she asked for that was not provided to her.[25] It is also consistent with the statements of Plaintiff's counsel made during the summary judgment hearing that Plaintiff never asked Defendants for an accommodation.[26]

It is one thing to argue that Defendants knew about Plaintiff's health conditions. But it is another to argue that Defendants knew she needed more time off from work in addition to the time she had already taken. Giving Plaintiff the benefit of the doubt and assuming Defendants

---

[25] Shauna Nebeker Deposition, CM/ECF No. 75-1, at 152:23-153:5; *see also* Opposition, *supra* note 5, at xxx.

[26] Hr'g 12/05/14 Tr., 51:8-15.

knew she had serious health conditions, it remains difficult to argue Defendants inadequately accommodated Plaintiff when Plaintiff neither requested additional time nor communicated to Defendants she needed additional time to seek further medical help.

Further, the court notes that Plaintiff acknowledges that Defendants allowed her to have runners come to her house to complete tasks that needed to be done if she was not able to come to the office.[27] Plaintiff has not identified an instance where she needed a runner to come to her house and one was not provided.

The court therefore finds that the undisputed facts indicate Defendants did not fail to reasonably accommodate Plaintiff's conditions. As such, the court finds Defendants' motion should be granted for this cause of action.

---

[27] Opposition, *supra* note 5, at xxix.

## II. CONCLUSION

Having determined that (i) Plaintiff was not terminated; (ii) there was no violation of public policy, even if a termination had occurred; (iii) Plaintiff failed to place Defendants on notice that Plaintiff had a serious health condition that warranted FMLA leave; and (iv) Defendants did not fail to reasonably accommodate Plaintiff's conditions, the court finds that summary judgment is warranted.

As such, the court orders that Defendants' summary judgment motion is GRANTED and Plaintiff's claims are DISMISSED WITH PREJUDICE.

Let judgment be entered accordingly.

DATED this 19th day of February, 2015.

Bruce S. Jenkins
United States Senior District Judge